IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: )<br>)<br>SCH CORP., et al., )<br>)<br>Debtors. ) | Chapter 11<br>Bank. No. 09-10198 (BLS) |
| CFI Class Action Claimants, )<br>)<br>Appellants, )<br>)<br>v. )<br>)<br>Carl Singley, Responsible Officer )<br>)<br>Appellee. ) | Civ. Nos. 12-1576-SLR |

**MEMORANDUM**

At Wilmington this 2nd day of April, 2014 having reviewed the appeal taken by the CFI class action claimants[1] ("CFI claimants"), and the papers submitted in connection therewith; the court issues its decision based on the following analysis:

1. **Background.**[2] Carl Singley ("Singley") is the disbursing agent, litigation designee, and responsible officer for SCH Corp., American Corrective Counseling Services, Inc., and ACCS Corp. (the "debtors"). (D.I. 18 at 1) Singley is counsel to the firm Ciardi Ciardi & Astin ("Ciardi"). (D.I. 17 at 15)

---

[1]Defined below.

[2]The factual background is largely undisputed and is taken from the United States Bankruptcy Court for the District of Delaware's ("bankruptcy court") oral order dated September 14, 2012 and supplemented by the parties' briefing.

2. Prior to the debtors' bankruptcy filings, class action litigations against the debtors occurred in California, Florida, Indiana, and Pennsylvania, alleging, among other harms, violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 et seq., and certain state statutes. The class action plaintiffs in California ("Del Campo"), Florida, and Indiana are collectively the "CFI claimants." The plaintiffs in the Pennsylvania case were separately represented. (D.I. 17 at 6-7)

3. On January 19, 2009 (the "Petition Date"), the debtors each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the bankruptcy court. The CFI claimants were actively represented by counsel in the chapter 11 case. (D.I. 18 at 6)

4. On February 10, 2009, the bankruptcy court approved the debtors' motion to conduct an auction for the sale of all the debtors' operating assets, over the objections of the CFI claimants. On March 3, 2009, the debtors filed a motion to approve the sale of substantially all of their assets and for certain related relief. (BR D.I. 202) The CFI claimants objected and moved to dismiss the bankruptcy as lacking in good faith. (D.I. 17 at 8; D.I. 18 at 6-7)

5. On March 31, 2009, the bankruptcy court conducted a hearing on both the debtors' motion to approve the sale and the CFI claimants' motion to dismiss. The bankruptcy court approved the sale, over the objection of the CFI claimants, and denied the motion to dismiss. The sale authorized the transfer of substantially all of the debtors' assets to National Corrective Group, Inc. ("NCG"), a subsidiary of LLCP. The CFI claimants did not appeal, and the sale was consummated on April 11, 2009. (D.I. 17 at 8; D.I. 18 at 7)

2

6. On or about May 22, 2009, the debtors filed a proposed plan for the sale to NCG. The proposed plan contained third-party releases, with the total consideration to the estates of approximately $2.5 million. After objections from the CFI claimants, the debtors abandoned the proposed plan. (D.I. 18 at 8)

7. On August 5, 2009, LLCP filed the first amended plan (the "amended plan"), which contained a second amendment (the "second amendment"). The second amendment required LLCP to fund up to $200,000 of plan funding per year for up to five years (the "post-sale payments"), with payments commencing on April 11, 2010. The second amendment also provided for certain reductions to the post-sale payments, i.e., an offset of up to 50% of each payment, including the cost of future lawsuits, and an advance of funds to the two law firms representing the debtor for unpaid counsel fees. (D.I. 17 at 10-12; D.I. 18 at 9)

8. On November 2, 2009, the bankruptcy court confirmed the plan, with an effective date of December 21, 2009. (D.I. 17 at 13-14; D.I. 18 at 9) The plan provided the following benefits to the CFI claimants: (a) all disputes regarding the validity of the class proofs of claims filed by the CFI claimants were deemed "resolved;" (b) the CFI claimants owned a 90% share of any distributions for the benefit of unsecured creditors, from which CFI counsel were given the right to claim $175,000 in bankruptcy legal fees; (c) the CFI claimant's attorney, Paul Arons ("Arons"), was named as the trustee of any funds designated for the CFI claimants; and (d) LLCP agreed to provide CFI counsel with data regarding certain fees consumers had paid. (D.I. 17 at 13) The plan identified two main sources of funds for the benefit of creditors: 1) the post-sale payments by NCG, and 2) a 70% share of the "Mealing litigation," a pending lawsuit by

LLCP against the prior owners of ACCS, which, under the plan, LLCP was to continue to pursue, while providing "monthly status reports" on the litigation to the estate's representative. (D.I. 17 at 13)

9. On January 4, 2010, Irv Acklesberg ("Acklesberg") and Arons, counsel for CFI claimants prior to and during the bankruptcy cases, along with other counsel, filed a new class action in the Northern District of California against LLCP and NCG, alleging claims under the FDCPA, RICO, and state law on behalf of Christina Smith and other plaintiffs. *See Christina Smith et al. v. Levine Leichtman Capital Partners, Inc., et al.*, Civ. No. 10-cv-0010 (N.D. Cal.) ("the *Smith* action"). (D.I. 17 at 15; D.I. 18 at 9-10) On March 9, 2011, the United States District Court for the Northern District of California granted a motion forcing withdrawal of Acklesberg and Aron in the *Smith* action, on conflict of interest grounds, finding that expenses incurred by LLCP and NCG in defending the *Smith* action would ultimately reduce the recoveries available to the Del Campo plaintiffs under the amended plan. The Ninth Circuit upheld the decision on October 31, 2012. (D.I. 18 at 10)

10. On April 30, 2010, Madeline Johnson, a member of the certified del Campo class and a CFI class claimant who had filed an individual proof of claim in the bankruptcy, filed a "class action" malpractice suit purportedly on behalf of all California CFI class members, against most of the CFI class counsel and their law firms, in Los Angeles state court ("the *Johnson* action"). The suit alleged conflicts of interests. (D.I. 17 at 16-17)

11. On November 23, 2010, Singley, on behalf of the liquidating estate, brought

4

an adversary action against the CFI lawyers who filed the *Smith* action and against all the *Smith* plaintiffs ("the *Singley* action"). The *Singley* action made allegations almost identical to those asserted in the motion in *Smith* and in the *Johnson* malpractice complaint. (D.I. 17 at 18-19)

12. A post-confirmation dispute began in December 2011 regarding the potential funding for the amended plan. On March 15, 2012, Singley filed a motion to approve a settlement ("settlement") to resolve the funding dispute. (09-10198-BLS, D.I. 812) On March 27, 2012, counsel for CFI claimants filed a motion to dismiss the bankruptcy cases for lack of good faith. (09-10198-BLS, D.I. 814)

13. Following a three-day evidentiary hearing, on September 14, 2012, the bankruptcy court issued an oral ruling approving the settlement and denying the CFI claimants' motion to dismiss. (09-10198-BLS, D.I. 932)

14. **Standard of Review.** This court has jurisdiction to hear an appeal from the bankruptcy court pursuant to 28 U.S.C. § 158(a). In undertaking a review of the issues on appeal, the court applies a clearly erroneous standard to the bankruptcy court's findings of fact and a plenary standard to that court's legal conclusions. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). With mixed questions of law and fact, the court must accept the bankruptcy court's "finding of historical or narrative facts unless clearly erroneous, but exercise[s] 'plenary review of the [bankruptcy] court's choice and interpretation of legal precepts and its application of those precepts to the historical facts.'" *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 642 (3d Cir. 1991) (citing *Universal Minerals, Inc. v. C.A. Hughes &*

Co., 669 F.2d 98, 101–02 (3d Cir. 1981)). The district court's appellate responsibilities are further informed by the directive of the United States Court of Appeals for the Third Circuit, which effectively reviews on a de novo basis bankruptcy court opinions. *In re Hechinger*, 298 F.3d 219, 224 (3d Cir. 2002); *In re Telegroup*, 281 F.3d 133, 136 (3d Cir. 2002).

15. **Analysis.** The CFI claimants largely do not contest the bankruptcy court's factual findings. Instead, the CFI claimants fault the bankruptcy court's approval of the settlement on various legal grounds. The bankruptcy court properly considered the *Martin* test's four criteria in determining that the settlement was "fair and equitable."[3] *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996); *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). The CFI claimants allege that the bankruptcy court failed to "carefully examine" the settlement to determine if it was "fair and equitable" to them, as "the parties who did not settle." *In re Nutraquest, Inc.*, 434 F.3d 639, 644-45 (3d Cir. 2006) (citing *TMT Trailer*, 390 U.S at 424, 435) (explaining that "[u]nder the 'fair and equitable' standard, [the Court] look[s] to the fairness of the settlement to other persons, i.e., the parties who did not settle."). The CFI claimants also dispute that the negotiation of the settlement was properly conducted, alleging collusion between Singley and LLCP/NCG.

16. At the outset, the court notes that the bankruptcy court's "trial took the better part of three days, . . . included live testimony from two witnesses, saw the introduction

---

[3] "(1) [T]he probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." 91 F.3d at 393.

6

of deposition testimony from several other witnesses as well as the admission of over one hundred separate exhibits." (09-10198-BLS, D.I. 932 at 2:8-12) The bankruptcy court carefully considered the fourth Martin factor -the paramount interest of the creditors- finding that

> the responsible officer faces a real prospect in the absence of a settlement that asserted offsets will consume every penny of NCG's otherwise required plan payments. . . . [T]he responsible officer has negotiated a settlement that assures receipt of some payments in the plan for years three through five totaling approximately $230,000 and provides for further payment of at least $75,000 and up to $300,000 in the following three years. . . . I don't know if a distribution will occur here for unsecured creditors, and that depends at least upon receipt of these funds, prosecution and disposition of claim objections and the outcome of the Mealing litigation. And as I acknowledged earlier, it does not look promising for unsecured creditors, but I cannot predict a future with certainty. I also note as an aside that the standard or prong here speaks to the paramount interest of all creditors, not just unsecured creditors. So I believe it is incumbent upon this Court to take a broader view of the benefit that is likely to be conferred here. What is apparent to me is that without this settlement there will be less available for creditors.

(*Id.* at 18:12-19:20)

17. The CFI claimants point to two letters as evidence of collusion. On October 27, 2009, Singley sent a letter to LLCP, enumerating his responsibilities as the responsible officer and disbursing agent. As part of these responsibilities, Ciardi and LLCP were required to execute a conflicts waiver and Ciardi was to terminate and not resume its representation of LLCP in the above-referenced cases. Further, Singley was to obtain conflicts counsel, should "a matter arise[] in these cases that may be adverse to LLCP." (09-10198-BLS, D.I. 680, ex. B at 5) On November 22, 2010, Ciardi sent a

7

letter to NCG (a) acknowledging that it was currently representing NCG or LLCP; (b) agreeing that it "[would] not bring any causes of action against NCG on behalf of Singley;" and (c) agreeing not to disclose confidential information to Singley. (D.I. 17 at 33)

18. The bankruptcy court found that "[t]he record developed at trial reflects that the responsible officer, through his counsel, commenced a dialogue with NCG and its parent in order to address the lack of plan payments and the validity of the asserted offsets." (09-10198-BLS, D.I. 932 at 5:12-17) The bankruptcy court reviewed the conflict waiver and disclosure provisions and specifically addressed the alleged collusion,[4] stating:

> It certainly does appear that the responsible officer has at times acted in concert with NCG, a circumstance that I believe has its roots in the fact that NCG is the primary source of funding for the plan. But the responsible officer's decision to cooperate with NCG, among other things, and affecting the settlement at issue here, does not mean that he has acted in bad faith or otherwise breached his duty . . .

(*Id.* at 9:18-23, 12:10-19)

19. The bankruptcy court found that "the settlement was in fact fairly and

---

[4]As to the *Johnson* action, the bankruptcy court stated that

> [d]eposition transcripts . . . do in fact appear to indicate that opposing counsel may have contacted a represented party. That is or may be troubling, but I certainly am not satisfied that I have the complete story, and that matter is not pending before me. And I further note that all of the activity that has been complained of, has occurred not here, but before other courts.

(09-10198-BLS, D.I. 932 at 13:8-15)

8

sufficiently negotiated and presented" and was "satisfied with the process by which this settlement was reached." (*Id.* at 16:7-9, 13-14) The bankruptcy court specifically took into account the challenges to "the [bona fides] of the settlement . . . [and the contentions] at trial that the responsible officer was not deeply involved in the negotiations and that it was handled exclusively by his counsel under constraints pursuant to the terms of their engagement not to sue NCG." (*Id.* at 16:2-7); *see In re Capmark Financial Group Inc.*, 438 B.R. 471, 515 (Bankr. D. Del. 2010) ("The court . . . should canvas the issues to determine whether the settlement falls above the lowest point in the range of reasonableness.").

20. The bankruptcy court sufficiently addressed the CFI claimants' arguments that "NCG began a multi-forum strategy to use the anticipated litigation and plan provisions concerning offsets as weapons to drive a wedge between the CFI consumers and their counsel." (D.I. 17 at 38) It declined to revisit "[t]he findings with respect to good faith, best interest and the process of developing, formulating and prosecuting the [amended] plan[, which] are contained in the confirmation order, and [to which] res judicata has attached . . . ." (09-10198-BLS, D.I. 932 at 7:21-25) Further, as to the CFI claimants' arguments with respect to the California actions, the bankruptcy court noted that "those courts are able to police their own proceedings." (*Id.* at 13:20)

21. **Conclusion**. For the reasons discussed above, the court concludes that the bankruptcy court did not err in approving the settlement.[5] Therefore, the court

---

[5]The CFI claimants offer little support for their argument that the settlement is actually a modification of the plan, subject to 11 U.S.C. § 1127. (D.I. 17 at 39-40) This argument does not appear to have been raised before. Singley's response that the settlement resolves a funding dispute and does not modify the amended plan is

dismisses the appeal and affirms the order of the bankruptcy court. An order shall issue.

                                                                                                          [signature]
                                                                                United States District Judge

---

consistent with the bankruptcy court's statement that,"[t]rying the issue would therefore likely involve witnesses' recollections as to the parties' intentions and expectations in negotiations and a deal that is now three years past." (09-10198-BLS, D.I. 932 at 17:24-18:2)